Craig **BROWNFIELD**, Sr., et al., Appellant,

v.

**MISSOURI PACIFIC RAILROAD COMPANY**, Appellee.

No. A14–88–130–CV.

Court of Appeals of Texas, Houston (14th Dist.).

June 7, 1990.

Rehearing Denied Aug. 23, 1990.

Gary M. Riebschlager, Douglas S. Sandage, Houston, for appellant.

Mary Ann Starks, Brad Beers, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and JUNELL and DRAUGHN, JJ.

## OPINION

J. CURTISS BROWN, Chief Justice.

This is an appeal from a take-nothing judgment in a suit involving an eight-year-old boy, Craig Brownfield, Jr., who was playing on a railroad trestle when he spotted a train approaching. At first, the boy ran from the train, then he turned back to try to save his five-year-old brother, who had crouched down on the side of the tracks. The younger boy survived, but the train struck and killed Craig. Appellants claim the jury's answers to the negligence and damage issues were so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. Appellants also contend the trial court erred in refusing to submit special issues regarding attractive nuisance.

### I

■ The trestle sits on land owned by appellee, and it stretches over a creek. Craig Brownfield, Jr., his brother Christopher, and their friend Ryan Groskopf, were on the trestle throwing rocks into the water when Craig shouted that a train was coming. Ryan, who was most familiar with the area, ran toward the train and jumped off onto some sand and rock. Craig began running in the opposite direction, then turned back to get Christopher, who had crouched alongside the tracks. Craig tugged at Christopher's arm and tried to get him to flee, but his brother remained where he was. Craig then tried unsuccessfully to outrun the train.

The engineer, Mr. James Zablosky, did not blow the train's whistle or sound the horn to warn the children, and the brakeman declined to state under oath that he was keeping a proper lookout down the track. The trestle was not fenced off, and the railroad company did not post "no trespassing" signs or otherwise alert those who might pass the area.

There was conflicting testimony about how the train's crew responded to the emergency. Mr. Zablosky's testimony was evidently inconsistent, in that he retracted various remarks he made both at trial and in prior written and oral statements, and electronic tapes taken from the train contradicted his version of the train's speed and his testimony that he applied maximum braking power. The jury answered "no" to Special Issue No. 1, which asked whether the railroad was negligent in (a) failing to keep a proper lookout; (b) failing to timely sound the horn and/or bell; (c) failing to timely apply the brakes.

The standard of review in determining sufficiency of the evidence is whether the jury finding is so against the great weight and preponderance of the evidence as to be clearly erroneous or manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). An appellate court will reverse only if the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex. 1985).

We do not find the weight of the adverse evidence to be overwhelming so as to warrant reversing the jury's verdict. Although the head brakeman, Mr. Richard Gibson, said he could not assure jurors he was looking down the track as the train approached the trestle, his job also included checking the sides and the rear of the train for objects that might come onto the track. The engineer testified that when he first sighted what turned out to be Christopher squatting by the track, he did not think it was a person. He said he trained his eyes to determine the nature of the object, he focused his attention on the child, and he applied the emergency brakes when he realized the object could be a child, an instant before he noticed Craig in front of the train.

Appellants reasoned that if the crew had been keeping a proper lookout and had seen the children, the engineer would have blown the train's whistle to warn the youngsters. Appellees agreed they did not sound a warning, but Mr. Zablosky explained that he did not want to frighten the crouching child and he was afraid the noise

would cause the boy to jump from the trestle, slip off, or fall onto the tracks.

Regarding application of the brakes, Mr. Zablosky testified that he stopped the train "the quickest and safest way possible." Appellants introduced electronic tapes that indicate he did not employ maximum braking power, in contrast to his assertions. At various stages of testimony, Mr. Zablosky withdrew several prior statements, but he also noted that "Tapes have been known to make mistakes," and that in terms of stopping distance, there is "very little difference" in applying maximum braking power and the amount which the tapes indicate he used.

Despite inconsistencies in testimony, much of which involved technical aspects of locomotive traffic, we find the evidence as a whole was sufficient to support the jury's finding that the train crew was not negligent in keeping a lookout, in choosing not to blow the whistle, and in applying its brakes to avoid hitting the children.

Appellants also claim that the jury, in assessing damages, acted out of passion or prejudice in disregard of the facts. Again, unless the findings are so against the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust, we cannot set aside the jury's decision regarding damages. *Thompson v. Mercantile Thrift Stores, Inc.*, 650 S.W.2d 120, 122 (Tex.App.—Houston [14th Dist.] 1983, no writ). It is extremely difficult to appraise another's pain and suffering, but that is the jury's function; this is a fact issue, and we should not substitute our opinion for the jury's when the verdict is supported by sufficient evidence. *Bill Hendrix Auto Parts v. Blackburn*, 433 S.W.2d 237, 241 (Tex.Civ.App.—Houston [14th Dist.] 1968, no writ). We overrule points of error one and two.

## II

■ The last question to be decided is whether the doctrine of attractive nuisance covers an ordinary railroad trestle. Before undertaking our own analysis of that issue, we note that appellants cite us to no case which holds a trestle to be so unreasonably

dangerous as to justify applying the doctrine. Nor does our research reveal a single decision so holding.

The literature dealing with the so-called attractive nuisance doctrine is voluminous, and the body of caselaw immense. Of course, the label "attractive nuisance" is widely understood to be a misnomer. *See* PROSSER ON TORTS § 59, at 400 n. 8 (5th ed. 1984); *see also* Prosser, *Trespassing Children*, 47 CALIF.L.REV. 427, 430–32 (1959) (on the history of the rule). In the first place, attractive nuisance has nothing to do with true nuisance. It is instead a part of negligence law. *Massie v. Copeland*, 233 S.W.2d 449, 451 (Tex.1950) ("the question in 'attractive nuisance' cases is one of negligence."); Prosser, 47 CALIF.L.REV. at 432 ("In other words, child trespasser law is merely ordinary negligence law...."). In the second place, the attractive nuisance label led some courts to bar recovery when the child had not been lured onto the land by the offending condition. So reasoned Justice Holmes for the United States Supreme Court in a pre-*Erie* case involving a pool of poisoned water. *United Zinc & Chemical Co. v. Britt*, 258 U.S. 268, 42 S.Ct. 299, 66 L.Ed. 615 (1922). There the Court distinguished its own decision which had introduced the rule to American soil, *Sioux City & Pac. R. Co. v. Stout*, 84 U.S. (17 Wall.) 657, 21 L.Ed. 745 (1873), preferring to follow instead the minority view of Justice Holmes' home state. Three justices dissented, however, and the more liberal approach finally gained approval twelve years later. *Best v. District of Columbia*, 291 U.S. 411, 54 S.Ct. 487, 78 L.Ed. 882 (1934); *see* PROSSER ON TORTS at 401 & n. 14 (characterizing *Best* as overruling *Britt*).

During the same year *Best* was decided the American Law Institute produced its first Restatement of Torts. Section 339 codified the more liberal view, rejecting the requirement of allurement to trespass. It was to become one of the Restatement's "most effective single section[s]." Prosser, 47 CALIF.L.REV. at 435. Less than twenty years later the Texas Supreme Court adopted § 339's four-part test for attractive nuisance questions. *Banker v.*

*McLaughlin,* 146 Tex. 434, 208 S.W.2d 843 (1948). The opinion laid out the following elements:

> (a) the place where the condition was maintained was one upon which the possessor know or should have known that small children would likely frequent the place and play about it;
>
> (b) the condition was one of which the possessor knew or should have known involved an unreasonable risk of death or serious bodily harm to such children;
>
> (c) the child, because of its tender years, did not realize the risk involved in going into the pool; and
>
> (d) the utility, if any, to [the possessor] of eliminating the danger was slight as compared to the problem of injury resulting therefrom.

146 Tex. 434 at 441, 208 S.W.2d at 847 (*citing* the Restatement); *see also Burk Royalty Co. v. Pace,* 620 S.W.2d 882, 885 (Tex.Civ.App.—Tyler 1981, no writ) (on the rejection of allurement as a requirement). When the drafters revised this portion of the Restatement, they did little in the way of substantive change. True, § 339 of the Second Restatement includes a new clause (e)—"the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children"—but that addition serves only to make explicit what had been understood, namely that attractive nuisance law is a negligence doctrine. Indeed, the drafters themselves later described clause (e) as "unaccountably omitted in the first Restatement;" they added it "to make it clear that this is only negligence liability, and that the defendant is not liable if he has used all reasonable care under the circumstances." RESTATEMENT (SECOND) OF TORTS § 339 reporter's note 5 (Appendix 1966).[1]

The other change worth our attention is a slight reformulation in clause (d), which now requires:

> the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved.

RESTATEMENT (SECOND) OF TORTS § 339. This verbal alteration, like the addition of clause (e), simply clarifies matters without shifting any of the underlying legal realities. It calls for courts to do exactly what they had already been doing. In the words of the reporter, "Clause (d) is revised to take into account the social utility of such things as railroad turntables, in addition to the utility of the condition to the possessor himself." *Id.* reporter's note 4. Immediately following this note is a paragraph of case citations, including a Texas precedent, *Courtright v. Southern Compress & Warehouse,* 299 S.W.2d 169 (Tex.Civ.App.—Galveston 1957, no writ). The *Courtright* opinion deserves examination because it provides a lucid example of how a court should perform the risk-utility analysis.

The question in *Courtright* was whether the attractive nuisance doctrine applied to moving vehicles. In that case a child of six had caught a ride on a string of trailers which the defendant used for moving cotton bales. While trying to move from one trailer to another, the boy fell between

---

1. The Second Restatement's version provides in full:

> § 339. Artificial Conditions Highly Dangerous to Trespassing Children
>
> A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if
>
> (a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and
>
> (b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

> (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and
>
> (d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and
>
> (e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

This version makes minor changes, such as eliminating the former requirement that the child be "young." *See id.* reporter's note 1 (Appendix 1966). Other alterations are discussed in the reporter's notes.

them and under the wheels. The *Courtright* opinion begins by citing *Banker v. McLaughlin,* noting that the supreme court had done away with the notion of allurement as a requirement for invoking the doctrine. 299 S.W.2d at 172. It then observes that

> the duties of a landowner do not extend to the oppressive or unreasonable, but are limited in all instances by circumstances and on considerations of the utility of the device or structure to the landowner in comparison with the likelihood of injury to the child and as well by the over-all feasibility of taking steps to prevent injury when the rights of owner and child alike are taken into account.

*Id.* The court went on to stress the need for *"reasonableness"* and a *"just balancing of rights"* in its analysis. *Id.* at 173 (emphasis in original). It then found the doctrine inapplicable for two main reasons. First, the court noted the supreme court's warning in *Banker v. McLaughlin* to use the doctrine with caution and only to invoke the special rule for a case "well within" its contours. 299 S.W.2d at 174 (*quoting* 208 S.W.2d at 850).[2] Second, the *Courtright* opinion expressed confidence in the wisdom of diverse courts which had examined the issue at various times. *See id.* at 175 ("we are convinced that the uniform result reached by all American courts on the question is sound and that we must follow it.").

Applying these principles, we begin with the supreme court's warning to employ the attractive nuisance rule with caution. In our judgment the doctrine does not apply here. It cannot apply here if we are to heed the high court's admonition. An ordinary railroad trestle is certainly not what *Banker v. McLaughlin* called "well within" the boundaries of attractive nuisance. To the contrary, Texas authorities regard a trestle as *outside* the doctrine's boundaries. *See Schroeder v. Texas & Pac. Ry. Co.,* 243 S.W.2d 261, 264 (Tex.Civ.App.—Dallas 1951, no writ); *Williamson v. Gulf,*

*C. & S.F. Ry. Co.,* 88 S.W. 279, 280 (Tex. Civ.App.1905, writ ref'd). Even if those precedents did not exist, appellants would still have no citations for the proposition that a trestle *is* an attractive nuisance. Considering the length of time that railroads have been with us, the pervasiveness of their use, and the age of the attractive nuisance doctrine, an argument from silence is a powerful one. So thought the *Courtright* panel, and we agree. The reader may search in vain through Dean Prosser's writings—and their hundreds of footnotes—for a single case holding a trestle to be an attractive nuisance. The reason, we think, is plain. Railroads perform an important social function, and trains simply have to cross whatever terrain lies between two given points.

This conclusion is buttressed by the Second Restatement's approach. That text lays out a general rule of negligence *nonliability* to trespassers in § 333, with exceptions articulated in §§ 334–339. The only relevant exception, § 339's provision for child trespassers, applies by name to "Highly Dangerous" conditions, a situation which we cannot regard a trestle to constitute. Even aside from putting any weight on the title, moreover, we find the risk-utility balance to militate in appellee's favor. The utility of a trestle is obvious. Such a structure is not like an open pond of poisoned water, a loose dynamite cap, or an uninsulated power cable. This balancing task demands judgment, to be sure, but our judgment is informed by the American Law Institute's observations:

> The public interest in the possessor's free use of his land for his own purposes is of great significance. A particular condition is, therefore, regarded as not involving unreasonable risk to trespassing children unless it involves a grave risk to them which could be obviated without any serious interference with the possessor's legitimate use of his land.

---

**2.** The supreme court's warning provides in full: The governing rules and principles, although well established, should be applied with caution; that is, they should be given application only when the controlling facts bring the case well within such rules and principles.
208 S.W.2d at 850.

RESTATEMENT (SECOND) OF TORTS § 339 comment n (discussing clause (d) of the five part test). The risk posed by a trestle is not the grave risk inherent in dynamite caps, and the interference required to change a trestle's nature is sufficiently serious to swing the balance away from liability. *Cf. Burk Royalty Co. v. Pace,* 620 S.W.2d 882 (Tex.Civ.App.—Tyler 1981, no writ) (doctrine applies to a *stationary,* unfenced oil pumping unit); *George v. Texas & N.O. R. Co.,* 290 S.W.2d 264 (Tex.Civ. App.—Galveston 1956, writ ref'd, n.r.e.) (doctrine does not apply to *moving* trains). A trestle is, in our view, more like a locked turntable than like an unlocked one.

We affirm the judgment.

DRAUGHN, Justice, dissenting.

Finding myself in disagreement with the majority's reasoning in Part II of the opinion, I respectfully dissent and therefore would reverse and remand the cause for a new trial. I perceive that the majority concludes that the attractive nuisance doctrine does not apply because an active railroad trestle can never be an attractive nuisance. Although as the majority notes, in *Schroeder v. Texas & Pac. Ry. Co., supra,* the Dallas Court of Appeals stated that a railroad trestle is not an attractive nuisance *per se,* I believe that even the reasoning in the *Schroeder* opinion would allow that when certain evidence exists, a case involving a railroad trestle could raise the issue of attractive nuisance. I view the majority's approach here to hold the opposite of the *Schroeder* opinion: they seemingly would hold that railroad trestles are per se *not* attractive nuisances. As support for that conclusion, the majority opinion relies on the fact that they have found no case in which such liability has been imposed in an incident involving a railroad trestle. Such a conclusion requires a presumptive leap in logic in which I cannot join. If we were to slavishly reason from this so-called "argument of silence" position to determine new directions for the law, I doubt the law would ever develop.

I view this case in a more limited manner than my fellow justices. Specifically, I conclude that if a particular case involving a particular railroad trestle provides the evidence necessary to raise the issue of attractive nuisance (or whatever label we might attach to it), a jury is entitled to decide the issue. If there is evidence to support special issues, the trial court's refusal to submit them is reversible error. *Southwestern Bell Tel. Co. v. Thomas,* 554 S.W.2d 672, 674 (Tex.1977). Here, I find the evidence was sufficient to warrant the submission of those requested special issues pertaining to attractive nuisance.

More than a century ago, the U.S. Supreme Court established a special rule for trespassing children in the case of a child who was injured while playing with a turntable on railroad land. *Sioux City & Pac. R. Co. v. Stout, supra.* The Supreme Court of Texas applied the doctrine in *Banker v. McLaughlin, supra,* based on a duty owed by the owner of dangerous premises to children, who would likely be drawn to the premises by the dangerous attraction. The court detailed the following elements of attractive nuisance: .

(a) the place where the condition was maintained was one upon which the possessor knew or should have known that small children would likely frequent the place and play about it;

(b) the condition was one of which the possessor knew, or should have known involved an unreasonable risk of death or serious bodily harm to such children;

(c) the child, because of its tender years, did not realize the risk involved . . .; and

(d) the utility, if any, . . . of eliminating the danger was slight as compared to the probability of injury resulting therefrom.

*Banker,* 208 S.W.2d at 847. The Supreme Court restated these conditions in *Massie v. Copeland,* 233 S.W.2d 449 (Tex.1950), and explained the responsibilities of both the trial judge and the jury in deciding an attractive nuisance case: *first,* the judge must find in the facts a duty to the particular child or parent, plus enough evidence to raise an issue of its violation; and *second,* the jury must find that the defendant violated his duty. *Massie,* 233 S.W.2d at 454;

*see* Green, *Landowners' Responsibility to Children*, 27 Tex.L.Rev. 1 (1948).

For the doctrine of attractive nuisance to apply, the child must be of such tender years that, because of his youth, he did not discover the condition or appreciate the risk involved in the dangerous trespass. This is Element (c) of the *Banker v. McLaughlin* test, and it is a question of law. *Massie*, 233 S.W.2d at 454; *Jannette v. Deprez*, 701 S.W.2d 56, 60 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). We agree with the Austin Court of Appeals that it cannot be said as a matter of law that an eight-year-old child cannot be protected from a condition that meets the elements of an "attractive nuisance." *Robertson v. Centennial Properties*, 392 S.W.2d 577, 584 (Tex.Civ.App.—Austin 1965, writ ref'd n.r.e.). In fact, the great majority of cases that have applied the attractive nuisance doctrine have involved children of less than ten years of age. *Massie*, 233 S.W.2d at 453. Craig Brownfield, Jr. was only eight years and three months old. He had failed first grade once, then passed it, and was scheduled to enter the second grade. Regarding his appreciation of the danger, his mother had told him not to play on the tracks, but fear of punishment is different than recognizing the danger of an activity that one's parents forbid. It is not mere knowledge of the existence of the condition that bars recovery but *appreciation of the danger* by the child. Under the facts of this case, I decline to impute to this eight-year-old child the ability to appreciate the time and distance it takes to outrun a mile-long train that weighs sixteen million pounds. I find the court erred in deciding as a matter of law that this child fully appreciated the danger involved so as to bar the submission of the issue of attractive nuisance.

Finding the attractive nuisance doctrine applicable to an eight-year-old child, I turn to the element of foreseeability of harm to the boy; this is the primary emphasis in determining whether the attractive nuisance doctrine applies. *Banker*, 146 Tex. 434, 208 S.W.2d 843, 849 (1948, citing Prosser on Torts); *Robertson*, 392 S.W.2d at 579. In this respect, it is sufficient that the appellee knew or should have known that children, by nature, would be attracted to the trestle. Restatement of Torts 2d, § 339, comment A; *see also* 40 Tex.Jur.2d §§ 62–63.

The element of foreseeability was addressed in the first question of Plaintiff's Requested Issue B:

> Do you find from a preponderance of the evidence that on the occasion in question, Missouri Pacific Railroad knew or should have known that children were likely to be present on or about the railroad trestle?
>
> ANSWER "Yes" or "No".

Sufficient evidence exists for the jury to consider in determining whether the railroad knew or should have anticipated that children would play on the trestle. The train's conductor said he had seen children of this age on railroad bridges before, children standing in the middle of a bridge throwing rocks into the creek, and children running off bridges to get out of the way of a train. Down this particular stretch between Houston and Conroe, the conductor "usually" saw children every day near the tracks or on the tracks, and the rear brakeman had seen children crossing the tracks and walking down them. Both of them agreed that this specific location looked like an area where eight- and nine-year-old children might play. Ryan Groskopf, Craig's companion, explained that "[a]lmost all the kids" cross the railroad tracks near the Brownfields' house as the only route to get to a swimming pool, which the engineer and the brakeman testified they had seen on one side of the tracks opposite a subdivision of homes and a trailer park on the other side. The brakeman stated that he would not be surprised to see children playing around the creek, and he said the track foreman told him he sometimes catches children on the tracks. The jury was entitled to consider this evidence to determine whether the railroad knew or should have known that small children were likely to play on or about the trestle.

The remaining questions in Plaintiff's Requested Issue B asked:

If you answered "Yes" above, do you find from a preponderance of the evidence that the manner in which Missouri Pacific Railroad Company maintained the railroad trestle was negligent?
ANSWER "Yes" or "No."
If you answered "Yes" above, do you find from a preponderance of the evidence that the manner of maintenance was a proximate cause of the occurrence in question?
ANSWER "Yes" or "No."

A trainmaster, appearing as the railroad's corporate representative, testified the trestle had no warning signs or "no trespassing" signs, nor was there a step-off along the trestle. A step-off, he explained, is an area four- to five-feet deep accompanied by a bannister or railing; although it may be installed for maintenance workers, it would give someone caught on the tracks a chance to jump out of the way of an oncoming train onto the step-off. He also testified that the railroad does not educate its engineers with maps showing residential or commercial areas near its right-of-way; it makes no systematic effort to identify areas along its right-of-way that are frequented by pedestrians; and it does not instruct them as to areas it knows to be frequented by pedestrians. However, the railroad does take precautions for other potential accidents. The brakeman, for example, testified that a train is required to blow its horn and ring its bell when it approaches an intersection.

The element of utility or practicality of eliminating the danger is included in the special issue inquiring as to the defendant's negligence. *Eaton v. R.B. George Investments, Inc.*, 152 Tex. 523, 260 S.W.2d 587, 592 (1953). In this regard, the trainmaster stated his belief that fencing off a trestle would be "impractical" because the railroad would be faced with such decisions as where to start and stop the fence, how high to build it, and whether to employ automatic gates.

Obviously, I do not question the usefulness of railroads or their tremendous benefit to society; however, I disagree with the conclusion that railroad trestles in general can never fall under the attractive nuisance doctrine because the cost of making one of them safer somehow outweighs the value of protecting those children who might be harmed. Because railroads serve the public should not, and does not, release them from conducting their transportation in a manner that will result in reasonable protection to those on their premises by express or implied invitation. *See McCoy v. Texas Power & Light Co.*, 239 S.W. 1105, 1110 (Tex.Comm'n App.1922, judgm't adopted) (holding that an electric power and light company, although engaged in serving the public, is not excused from failing to properly protect those in its vicinity). Here, there was sufficient evidence before the jury to support appellant's submission of the issue. The jury could have concluded that the children's safety warranted the addition of warning signs or step-offs or partial fencing off of the trestle, even if that meant the railroad had to decide how high to build the fence or where it should start or stop. The jury might have reasoned that an eight-hundred-foot-long trestle where children played warranted similar warning precautions as exist for an intersection. Additionally, jurors who drive cautiously near children's playgrounds may have concluded that it would not have been impractical for the railroad company to have implemented a policy of requiring trains to slow down through an area where children were known to play, although the engineer testified that the train traveled towards the trestle at sixty miles per hour, the track's maximum speed, on the day of the accident.

Because the pleadings and the evidence supported the submission of attractive nuisance issues to the jury, the trial court improperly denied the Brownfield family a separate and independent ground of recovery by ruling that as a matter of law the attractive nuisance doctrine did not apply. I do not, indeed I cannot, make any conclusion as to whether the appellant might prevail on this issue since the burden of proving the stringent requirements of the attractive nuisance doctrine is great, as it should be. However, given the facts raised by this evidence, it is a matter best suited

for a jury to answer. As the *Sioux City* court stated more than one hundred years ago, "It is assumed that twelve men know more of the common affairs of life than does one man, that they can draw wiser and safer conclusions from admitted facts thus occurring than can a single judge." *Sioux City*, 84 U.S. at 664.

Each case where the question of attractive nuisance is raised must be evaluated on its own unique facts by the trial judge to determine if the jury should consider it. The evidence concerning the death of this eight-year-old child did not warrant a judicial finding that as a matter of law he appreciated the danger involved. The issue of attractive nuisance should have been submitted to the jury so that they could determine if the rigid requirements of this doctrine were affirmatively supported by the evidence.

I would reverse the judgment and remand the cause for a new trial.